## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATIE LACAVA,

        Plaintiff,

    v.

PITTSBURGH PUBLIC SCHOOLS,

        Defendant.

Civil Action No.

**JURY TRIAL DEMANDED**

## COMPLAINT

### I.   INTRODUCTION

1.     Plaintiff Katie LaCava ("LaCava"), a white female, was hired by Pittsburgh Public Schools ("PPS") in January 2009 and assigned in September 2009 to the Pittsburgh Northview Accelerated Learning Academy ("Northview") to teach students from grades 3-5 in the emotional support classroom.   She alleges that her PPS supervisors at Northview discriminated against her on the basis of race, created a hostile work environment, retaliated against her for complaining about discrimination, and that PPS subjected her to disparate treatment and ultimately constructively discharged her in June 2010 based on her race and in retaliation for complaining about discrimination.

2.     Northview Principal, Dr. MiChele Holly ("Holly") and Assistant Principal Deborah Hollis ("Hollis"), both black females, and LaCava's supervisors, subjected Plaintiff to discrimination, retaliation for opposing discrimination and disparate treatment based on her race, including rating her performance "Unsatisfactory."   As a first or second year teacher in PPS this meant that LaCava would be terminated at the end of school year and barred from rehire unless

she resigned.  Holly and Hollis subjected LaCava to discriminatory treatment throughout her tenure at Northview, and they ramped up their efforts after LaCava complained about the paraprofessional assigned to her classroom, Faye Cosby ("Cosby"), a black female who was friendly with Holly and Hollis and often socialized and ate lunch with them.  Cosby was assigned to the emotional support classroom to provide assistance as directed by LaCava. Instead of assisting LaCava, Cosby spent her time paying her bills, planning her daughter's wedding, and at times, even sleeping.  When LaCava complained about this to her supervisors, Holly and Hollis, they met with LaCava and Cosby together, ostensibly to address the complaint. At the meeting, Cosby became irate, and Holly called six school police officers to physically remove LaCava from her own classroom.

3.     By subjecting LaCava to discrimination and a hostile work environment based on her race and retaliation because Plaintiff complained about disparate treatment, Defendant Pittsburgh Public Schools violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq. ("Title VII") , and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et. seq. ("PHRA").

## II.     JURISDICTION AND VENUE

4.     This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and § 1343, and supplemental jurisdiction over her related state law claims under 28 U.S.C. § 1367.

5.     Since all of the violations alleged occurred in Allegheny County, venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391.

### III.    PARTIES

6.      Plaintiff Katie LaCava is a 32 year-old white female who grew up and now resides in Pittsburgh, Pennsylvania.  LaCava is an experienced and accomplished teacher.  She has worked as a teacher since 2003, first as a Special Education Teacher in Virginia schools from 2003 until 2009, and then when she returned to Pittsburgh and was hired by Pittsburgh Public Schools.  She taught at the Northview Accelerated Learning Academy from September 2009 until June 2010, when she resigned in lieu of discharge.  At all times relevant to this case, LaCava was an "employee" of Defendant within the meaning of Title VII and the PHRA.

7.      Defendant Pittsburgh Public Schools operates, administers and is responsible for the public school system in the Pittsburgh school district.  PPS operates more than 50 schools and employs more than 5,000 individuals.  At all times relevant to this case, Pittsburgh Public Schools was an "employer" within the meaning of Title VII and the PHRA.

### IV.    FACTS

8.      LaCava has been a school teacher since 2003.  She first worked as a special education teacher in the public schools of Prince William County, Virginia and for a summer session at Southwood Psychiatric Hospital in Pittsburgh.

9.      From 2003 until the 2009-2010 school year at Northview under Holly, LaCava had always received high ratings from her supervisors.

10.     While teaching in Virginia, LaCava maintained an application "on file" with PPS because she grew up in Pittsburgh and desired to return to be closer to her family.

11.     In January 2009, LaCava was hired by PPS and assigned to teach kindergarten and first grade students in the emotional support classroom at Fulton Elementary School.  For the Spring 2009 semester at Fulton, LaCava was rated "Satisfactory" and her supervisors had no

complaints about her performance.  In September 2009, LaCava was transferred to Northview and assigned to teach third through fifth grade students in the emotional support classroom.

12.    Emotional support classrooms are special education classrooms designed to provide emotional and behavioral support for students who have been assessed as in need of therapeutic emotional support.  Glade Run, a mental health services provider, assigned a full-time therapist, Aaron Smith, a white male, to LaCava's classroom. Faye Cosby, a paraprofessional and a black female employed by PPS, was assigned to LaCava's classroom as an aide.

13.    At the beginning of the school year in early September 2009, the Northview administration ordered one of LaCava's students, age 9 or 10, to go home because she had not taken her medication that day and was acting out.

14.    LaCava learned that no family member was available to pick up this student to make certain she arrived home safely; nor were there any family members at home to attend to her after she arrived.

15.    Based on LaCava's years of prior teaching experience with special education students who required medication, Plaintiff was highly concerned that a 9- or 10-year old girl, who was off her medication, was being left to make her way home unaccompanied and that no responsible family member was at home to make certain she was properly cared for.

16.    Even under these circumstances, Northview administration would not allow the student to stay at school until they could contact her family members to arrange safe transit and appropriate care.  To protect the student, LaCava felt compelled to take the child home herself, which she did.

17.     When Hollis learned that LaCava had taken the student home, she threatened to "call the cops."  Later, Holly issued a written "Critical Incident" report in which she reprimanded LaCava for taking the student home.

18.     Thereafter, LaCava took a number of steps to "fit in" at Northview.  Among other things, she volunteered for committees and regularly sought Holly's advice and input on teaching-related matters.

19.     Throughout the Fall 2009 semester, LaCava made certain she updated Holly regularly on classroom activities and school-related matters by email and face-to-face.  Plaintiff expressed genuine enthusiasm about her work at Northview to Holly and her other supervisors in the special education department.

20.     By mid-October 2009, Holly expressly recognized LaCava's efforts and in an email to LaCava wrote:

> Your room is really progressing.  I peeked in several times today
> and they were all engaged.  Keep up the good work.

21.     In or around late fall and early winter 2009, LaCava began to experience problems with Cosby, the aide assigned to her room and a black female.

22.     Cosby's job was to assist LaCava with lessons and keeping students on task. Instead, she spent most of her time at work on personal matters—writing checks and paying bills, planning her daughter's baby shower and wedding, and doing things unrelated to her job.

23.     Smith, the Glade Run therapist assigned to LaCava's classroom, alerted LaCava several times throughout the Fall semester that Cosby had actually fallen asleep during lessons.

24.     During the 2009-2010 school year, all but one of the aides at Northview were black.  The black paraprofessionals regularly congregated in Holly's office—apparently with Holly's permission or invitation—where they relaxed, chatted and ate lunch together.

25.     Holly and Hollis maintained particularly warm and friendly relationships with this group, often greeting these aides in the hallways with, "Hey, Diva!"

26.     Holly and Hollis did not treat white faculty and staff, including LaCava, in the same friendly manner.

27.     White faculty and staff were not invited or permitted to use Holly's office to congregate, relax and eat lunch.

28.     At a meeting with a literacy professional in January 2010, LaCava suggested that additional training for the aides might be helpful.

29.     When Cosby learned of LaCava's suggestion, she became outraged and even yelled at LaCava in front of her emotional support classroom students.

30.     After Cosby's outburst in front of the students, LaCava met with Holly to discuss the event and the problems with Cosby's conduct and lack of assistance described above.

31.     In the discussion with Holly, LaCava reported Cosby's lack of attention to her duties and students.

32.     On or around January 15, 2010, Holly met with LaCava, Cosby, Hollis and a special education professional, Rochelle Chatman, also a black female.

33.     LaCava understood the meeting was to discuss the problems with Cosby's classroom conduct that Plaintiff had raised earlier with Holly.

34.     When the meeting began, Cosby became loud, belligerent and began yelling at LaCava.

35.     LaCava became uncomfortable with Cosby's verbal attack—and Holly's apparent indifference to it—and asked Holly to summon a union representative.

36.     Instead of summoning the union, Holly declared that the meeting was over.

37.    When LaCava stood up to leave, the others remained seated.

38.    LaCava asked Holly, "Is the meeting really over?" and said that if they were going to continue the discussion she would like to remain.

39.    At this point, Holly called to summon the Pittsburgh Public School Police, stating that LaCava "refused to leave [her] office."

40.    In fact, after Holly called the School Police, LaCava left Holly's office of her own volition and returned to her classroom in an attempt to avoid any further problem.

41.    After LaCava left, Holly did not call off the police.

42.    Five officers responded, all of whom were black males, and Holly sent them after LaCava in her classroom.

43.    With the students still present, the five School Police officers, charged into the emotional support classroom and ordered LaCava to leave school premises immediately.

44.    Shocked by this show of force and humiliated by being ordered to leave in front of her students, LaCava left Northview immediately and without further incident, escorted by the five School Police officers.

45.    LaCava's students told LaCava that after she left Holly came to the classroom and instructed all of them to write statements that LaCava had "slammed the door" as she was leaving.

46.    In fact, LaCava did not slam the door when she was ordered to leave.

47.    As a result of these events, Holly put LaCava on administrative leave for eight (8) days, from January 18-26, 2010.

48.    Cosby was never disciplined for her conduct in the meeting.

49.     Also, Holly never addressed the issues LaCava raised about Cosby's inattention to her work and the students.

50.     Later, LaCava reported to a PPS official that Holly and Hollis were "targeting" her because she complained about Cosby.

51.     LaCava also complained about the disparate treatment directly to Holly and Hollis on several occasions from January 2009 until the end of the school year.

52.     LaCava requested a transfer elsewhere in the district in order to remove herself from discriminatory treatment and the hostile environment at Northview.

53.     A week after LaCava returned from administrative leave, Holly placed her on an Employee Improvement Plan ("EIP").

54.     Over the next several months, Holly, Hollis, and Chatman regularly showed up in LaCava's classroom to "observe" her.

55.     LaCava was also ordered to attend numerous "EIP meetings".

56.     During this time, Northview administrators began claiming that student discipline referrals from LaCava were "lost." As a result, LaCava's students were not properly disciplined for misconduct or acting out.  The same administrators had never lost any discipline referrals submitted by LaCava before the Cosby incident.

57.     During this time, Holly and Hollis issued highly negative evaluations of LaCava. They focused on alleged poor student behavior and ignored the fact that the students in LaCava's classroom were placed there because they had a history or acting out and bad behavior.

58.     Even LaCava's students saw that LaCava's relationship with Holly and Hollis had become strained, saying things like: "Ms. Hollis hates you," and "Why don't you just sue Ms. Hollis for harassment?"

8

59.     Although several reviews of LaCava evaluated her as making progress during the

EIP, on May 25, 2010, Holly assigned her a rating of "Unsatisfactory" for the school year.

60.     Holly cited classroom observations in justification of her rating such as:

> Ms. LaCava's classroom is often characterized by students who act
> inappropriately and who are disengaged in the learning.  She spent
> an inordinate amount of time teaching to only one or two students
> while the others misbehaved and roamed around the classroom.  In
> terms of lesson planning and preparation, objectives of the lesson
> were not evident nor addressed in each lesson.

61.     Holly's evaluation conflicts with positive reviews of LaCava from other observers

during the EIP, who, unlike Holly, offered helpful suggestions for improving her classroom

technique.

62.     For example, Kimberly Zangrilli ("Zangrilli"), a white female, assessed LaCava

during a March 8, 2010 observation as follows:

> . . . Students were seated in there [sic] seats and followed along
> while reading the story "Dear Mrs. LaRue."  Ms. LaCava would go
> back and ask comprehension questions based on what was read.
> She utilized context clues on a basic level with students and could
> have extended the lesson to include other content areas (ie. math)
> and literary terms. . . .

63.     By contrast, Hollis focused only on poor student behavior and a week after

Zangrilli's review, wrote:

> . . . Students continue to speak out without raising their hands
> about anything.  Ms. LaCava again reminds students to raise their
> hands before speaking out.  After the story, Ms. LaCava asks
> students to give her three "big ideas" or facts from the story.  One
> student is playing with a paper airplane, another student's head is
> under the desk, and another student is playing with a book mark.
> All students are not engaged. . . .

64.     According to Smith, the classroom therapist, during Hollis' March 15, 2010

observation of the class, there were no emotional outbursts or behavioral problems.

65.     In sharp contrast, Holly and Hollis were generous in their praise for Cosby in the reviews they wrote for LaCava's EIP observations, noting for instance in one report that, "Ms. Cosby begins working with the Tri group where all students are engaged in the learning process."

66.     After Holly issued the "Unsatisfactory" rating to LaCava on May 25, 2010, LaCava informed her union representative that she would need a half day off on May 26, 2010.

67.     The union representative assured her she would suffer no negative consequences if she took a half-day off.

68.     When LaCava requested the time from Holly, Holly responded that if she took the half-day off, Holly would be consider it "job abandonment."

69.     Needing the time off and believing she was entitled to it under the collective bargaining agreement, LaCava left school early on May 26, 2010.

70.     As she left the building, LaCava was speaking with her union representative by phone.  Frustrated by the situation, LaCava told the union representative that it was "bullshit."

71.     No students were within earshot when LaCava spoke on her phone, but Holly overheard her.

72.     Even though LaCava was engaged in a private conversation and was exiting the building, Holly again summed the School Police for assistance and again, the police arrived in force.

73.     LaCava was the only teacher for whom Holly ever summoned the School Police.

74.     Holly issued another written reprimand to LaCava for this incident.

75.     Holly put LaCava on administrative leave again, and LaCava never returned to Northview after this incident.

76.     Due to stress and anxiety caused by Holly and Hollis' treatment, LaCava sought professional help from a psychologist, Donald Zandier.

77.     Zandier recommended a leave of absence for LaCava.

78.     Based on Holly's "Unsatisfactory" rating, under PPS policy and practice LaCava, then a "temporary professional employee," would be discharged at the end of the school year.

79.     LaCava was advised by the union to resign rather than be fired, as a discharge would make it virtually impossible for her to ever work again as a teacher.

80.     Accordingly, LaCava resigned to avoid being fired.

81.     Under these circumstances, her leaving is a constructive discharge.

82.     On information and belief, Holly and Hollis issued 5 "Unsatisfactory" ratings to teachers at Northview for the 2009-2010 school year, including LaCava.

83.     On information and belief, two (2) of them were black and three (3) were white.

84.     On information and belief, the three (3) white teachers rated "Unsatisfactory" were all "temporary professional employees" under the School Code, 24 P.S. § 11-1101(3) and therefore, would be fired at the end of the school year.

85.     On information and belief, the three (3) white teachers resigned their employment with PPS.

86.     On information and belief, the two (2) black female teachers rated "Unsatisfactory" were tenured and thus did not face termination.

87.     On information and belief the two (2) black teachers are still employed by PPS.

88.     LaCava timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 10, 2010, which was dual-filed with the Pennsylvania Human Relations Commission ("PHRC").

89.     The EEOC issued a Notice of Right to Sue on June 20, 2013.

90.     It has been over one year since LaCava's Charge was dual-filed with the PHRC.

91.     LaCava has exhausted her federal and state administrative remedies.

## V.   CAUSES OF ACTION

### Count I – Violations of Title VII

92.     The foregoing allegations are incorporated as if set forth in their entirety.

93.     The conduct of PPS and its supervisors as described above subjected LaCava to disparate treatment in the terms and conditions of her employment on the basis of her race (white), unreasonably interfered with her ability to perform her job, and created an intimidating, humiliating, and hostile work environment in violation of Title VII.

94.     The conduct of PPS and its supervisors in treating LaCava less favorably than similarly situated black co-workers violates Title VII.

95.     By retaliating against LaCava for opposing conduct made unlawful under Title VII, PPS violated Title VII.

96.     As a result of PPS's conduct, LaCava lost wages and other emoluments of employment, and suffered from severe emotional distress, anxiety, mental anguish, and humiliation.

### Count II – Violations of the Pennsylvania Human Relations Act

97.     The foregoing allegations are incorporated as if set forth in their entirety.

98.     Based on the foregoing, in subjecting LaCava to disparate treatment and a hostile environment based on her race, and retaliating against her for opposing conduct made unlawful under the PHRA, PPS violated the PHRA.

99.     As a result of PPS's violations of the PHRA, LaCava lost wages and other emoluments of employment; and she has suffered from severe emotional distress, anxiety, mental anguish, and humiliation.

## VI.   PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that the Court:

a)     Assume jurisdiction of her case;

b)     Find and declare that the Defendant discriminated against Plaintiff in the terms, conditions, rights and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, and enjoin such further conduct by the employer;

c)     Find and declare that the Defendant discriminated against Plaintiff in the terms, conditions, rights and privileges of her employment in violation of the Pennsylvania Human Relations Act and enjoin such further conduct by the employer;

d)     Award Plaintiff such back pay, front pay, employment benefits and all other emoluments of employment as if the discharge had not occurred;

e)     Award Plaintiff compensatory and consequential damages and punitive damages;

f)     Award Plaintiff such costs and expenses of suit, and reasonable attorneys' fees, expert witness costs, and such other relief as the Court deems necessary and proper after trial of this matter;

g)     Find for the Plaintiff and against the Defendant on all counts of this Complaint; and

h)     Order such other and further relief as may be deemed just and proper.

Respectfully submitted,

Dated:  September 18, 2013

/s/Emily Town

Emily E. Town
PA ID No. 309881
etown@stembercohn.com
John Stember
PA ID No. 23643
jstember@stembercohn.com
**STEMBER COHN &
        DAVIDSON-WELLING, LLC**
429 Forbes Avenue
1616 Allegheny Building
Pittsburgh, PA  15219
T.: (412) 338-1445
F.: (412) 338-1446

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATIE LACAVA, | |
| Plaintiff, | Civil Action No. |
| v. | |
| PITTSBURGH PUBLIC SCHOOLS, | JURY TRIAL DEMANDED |
| Defendant. | |

**JURY TRIAL DEMAND**

Plaintiff demands trial by jury on all claims so triable in the above-captioned action.

Respectfully submitted,

Dated:  September 18, 2013

/s/Emily Town
Emily E. Town
PA ID No. 309881
etown@stembercohn.com
John Stember
PA ID No. 23643
jstember@stembercohn.com
**STEMBER COHN &**
**DAVIDSON-WELLING, LLC**
429 Forbes Avenue
1616 Allegheny Building
Pittsburgh, PA  15219
T.: (412) 338-1445
F.: (412) 338-1446

*Attorneys for Plaintiff*